370 A.2d 712

**COMMONWEALTH of Pennsylvania**

v.

**Bernard SPARROW, a/k/a Bernard Johnson, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued Nov. 26, 1974.

Reargued Oct. 15, 1976.

Decided Feb. 28, 1977.

James J. DeMarco, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Deborah E. Glass, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

Following a trial before a jury, appellant was convicted of murder in the first degree and aggravated robbery. He filed timely motions for a new trial and in arrest of judgment which were denied by the court en banc. He was subsequently sentenced to life imprisonment for murder and to a consecutive term of from ten to twenty years imprisonment for robbery. This appeal followed.[1] Appellant presents a number of assignments of error, none of which, we have concluded, merits reversal. Accordingly, we will affirm.

The evidence presented at trial, viewed in a light most favorable to the Commonwealth as verdict winner, established the following facts. In the late afternoon of October 15, 1971 one Keith Moore obtained a silver-barrelled .32 caliber pistol from a friend. Shortly thereafter Moore learned from his brother and two others that Bernard Sparrow, the defendant, was looking for him. The four men then left Moore's house and began walking,

1. Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202, 17 P.S. § 211.202 (Supp.1975-76). An appeal from the judgment of sentence imposed on the robbery conviction was taken to the Superior Court. That appeal was certified to this Court.

Moore taking the gun with him in a paper bag. One member of the group, Erie Boyd, left the others for a short while and returned with two bullets. He thereupon asked for and was given the gun, which he placed in his trousers.

Soon the group was augmented by two other persons, Kenneth Wallace and Jerome Bryant. Bryant informed the others: "We're rumbling white boys at 16th and Morris." He asked if any of the others had a weapon, whereupon the pistol was given to Bryant by Boyd, and loaded. Later Wallace asked for the weapon and Bryant complied. As the group reached the corner of Dickinson and Mole Streets in Philadelphia they were joined by the defendant, who demanded the pistol from Wallace and was given it. Sparrow was then heard to boast: "I'm going to get me a homicide." He made it clear that the object of his remark would be a white person.

Sparrow, Bryant and Wallace, separated from the other members of the group, then proceeded along Mole Street. Sparrow carried the gun underneath his coat and expressed his intention to rob someone. As they were walking, an automobile being driven along Mole Street stopped and a white male alighted. This person, later identified as Joseph Jaworski, opened the car's trunk and began removing some pies. Wallace walked past Mr. Jaworski, but Bryant and Sparrow approached him from opposite directions, the appellant from the sidewalk side and Bryant from the street side. Sparrow waved the gun in Jaworski's face, saying, "You don't think this gun is real, do you?" When Jaworski rejoined that he did believe the gun was real, the defendant ordered, "Give me your money." Jaworski told the defendant he didn't have any money and began calling for help. As he was shouting, the defendant fired the pistol once, killing Mr. Jaworski instantly. Sparrow was subsequently arrested, tried and convicted as detailed above.

■ At trial, the appellant testified in his own behalf, giving an account of his actions at the time of the shooting which differed from that which he had given to the police during interrogation following his arrest. On cross-examination the prosecuting attorney confronted Sparrow with his testimony at a pre-trial suppression hearing that his statements to the police were true. It is now contended that this use of the suppression record violated Pa.R.Cr.P. 323(g), 19 P.S. (1975 pamphlet).[2] We considered and rejected this argument in *Commonwealth v. Ravenell*, 448 Pa. 162, 292 A.2d 365 (1972), wherein we observed: "[W]henever a defendant's credibility is an issue it is in 'the interests of justice' to show that he had testified in a completely contrary manner at an earlier hearing in the same case. To decide otherwise would be tantamount to the condoning of perjury." 448 Pa. at 174, 292 A.2d at 371. See also *Commonwealth v. Good*, 461 Pa. 546, 552–553, 337 A.2d 288, 291 (1975). There was here no misuse of suppression testimony.

The statements made to the police were themselves also used by the prosecution to impeach Sparrow on cross-examination at trial. Error is assigned to such use on the ground that, although the suppression court had held the statements to be voluntary, they were obtained in violation of appellant's constitutional rights, and therefore could not be used for any purpose.[3] See *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975).

---

**2.** Paragraph (g) of Rule 323 of our Rules of Criminal Procedure provides as follows:

"(g) A record shall be made of all evidence adduced at the [suppression] hearing. The clerk of court shall impound the record and the nature and purpose of the hearing and the order disposing of the application shall not be disclosed by anyone to anyone except to the defendant and counsel for the parties. The record shall remain thus impounded unless the interests of justice require its disclosure."

**3.** The statements were to a large extent exculpatory, Sparrow denying in them that he was present at the scene of the killing; they were not introduced into evidence by the Commonwealth in its case in chief.

■ The main thrust of this argument is that the confession was involuntary because (among other reasons) of denial of access to appellant's lawyer during the police interrogation.[4] The suppression court heard all of the evidence relating to the circumstances under which the statements were obtained, including conflicting testimony on the question whether the defendant had requested and been denied an opportunity to consult with an attorney. The court found that the statements were voluntary and that none of appellant's constitutional rights had been denied him. Under these circumstances, as we have held, "[t]he findings of the trier of fact, supported by the record, may not be disturbed. *Commonwealth v. Karchella*, 449 Pa. 270, 273, 296 A.2d 732, 733 (1972); *Commonwealth v. Garvin*, 448 Pa. 258, 269, 293 A.2d 33,

---

4. Appellant also asserts that the use of the statements for impeachment purposes should have been prohibited because they were obtained during a period of "unnecessary delay" between the time of his arrest and his preliminary arraignment. See Pa. R.Cr.P. 130; *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972). We have never had occasion to consider whether the exclusionary rule of *Futch,* established pursuant to our supervisory authority and designed to discourage excessive detention in police custody of persons under suspicion of crime before bringing formal charges, should extend to the use of confessions for impeachment purposes. The exclusion involved in *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975), of course, was based on the constitutional infirmity of the statement there sought to be used for impeachment. However that may be, the alleged delay defect may not be considered on this record. Although the *Futch* decision preceded the suppression hearing in the case at bar by approximately six months, the point was first raised in post-verdict motions. This was too late. *Commonwealth v. Tucker,* 461 Pa. 191, 335 A.2d 704 (1975); *Commonwealth v. Segers,* 460 Pa. 149, 331 A.2d 462 (1974); *Commonwealth v. Johnson,* 457 Pa. 554, 327 A.2d 632 (1974); *Commonwealth v. Reed,* 458 Pa. 8, 326 A.2d 356 (1974); *Commonwealth v. Blagman,* 458 Pa. 431, 326 A.2d 296, 300 (1974). In aid of the unnecessary delay argument the appellant also asserts that his arrest was illegal, apparently because made without a valid warrant. While we fail to see the pertinence of the arrest question to the issue of delay, the question cannot be considered because, as stated above, the delay issue itself is untimely raised.

39 (1972)." *Commonwealth v. Johnson*, 457 Pa. 554, 557–58, 327 A.2d 632, 634 (1974).[5]

5. The dissenting opinion of Mr. Justice ROBERTS states, mistakenly as we believe, that we have applied an improper standard for assessing the voluntariness of appellant's confession. The standard which it would have us apply in this case is drawn from a portion of the opinion of Mr. Justice Frankfurter announcing the judgment of the Court in the case of *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) and followed by this Court in a number of cases starting with *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968). That we have not departed from the guidelines espoused by Mr. Justice Frankfurter can be seen if the relevant portion of his opinion is viewed in its entirety:

 "Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear subject to whatever corrective powers a State's appellate processes afford.

 "This means that all testimonial conflict is settled by the judgment of the state courts. *Where they have made explicit findings of fact, those findings conclude us and form the basis of our review—with the one caveat, necessarily, that we are not to be bound by findings wholly lacking support in evidence.* See *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654. *Where there are no explicit findings, or in the case of lacunae among the findings,* the rejection of a federal constitutional claim by state criminal courts applying proper constitutional standards resolves all conflicts in testimony bearing on that claim against the criminal defendant. *In such instances, we consider only the uncontested portions of the record: the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted."* (citations and footnote omitted) (emphasis added) 367 U.S. at 603–04, 81 S.Ct. at 1879–1880, 6 L.Ed.2d at 1058.

It is apparent from the italicized portions of this quotation that, in Justice Frankfurter's formulation, there are two separate standards to be used by an appellate court in considering the voluntariness of a defendant's confession. One is to be applied where there are findings of fact by the trial court; the other, where there are none.

In the present case, the suppression court made four explicit findings:

 "1. The Commonwealth, through the testimony of police officers, established by a preponderance of credible testimony that the statement of defendant was voluntary.

 "2. The defendant was warned of his rights on three occasions and, otherwise, received the benefit of procedural and substantive safeguards set forth by the United States Supreme Court.

██ Appellant also objects to the latitude allowed the district attorney in the cross-examination of Sparrow's sister, Joan Sparrow. Before trial, Joan made certain threatening remarks to a prosecution witness. After she had testified on behalf of her brother, she was asked by the district attorney if she had made such threats, and whether she had been warned by the district attorney that it was illegal to threaten a witness. The trial court overruled objections to these questions and Joan Sparrow then answered affirmatively. "[T]he scope or limitation of cross-examination is largely within the discretion of the trial court, and its action will not be reversed in the absence of an abuse of such discretion. *Commonwealth v. Woods*, 366 Pa. 618, 79 A.2d 408 (1951)." *Commonwealth v. Cheatham*, 429 Pa. 198, 203–04, 239 A.2d 293 (1968); see also *Commonwealth v.*

> "3. The evidence shows that the defendant was alert, responsive, normal and not under the influence of drugs or intoxicants at the time of the statement.
> "4. The statement was obtained by police without fear, threats, brutality or other forms of duress, or in response to any direct or implied promises."

Furthermore, the court in its memorandum opinion accompanying these findings stated that "[t]he interrogation was not prolonged." Under these circumstances, applying the first portion of the *Culombe* test, *supra*, "those findings conclude us and form the basis of our review," provided they are supported by the record. Our review of the record satisfies us that the suppression court's findings were fully supportable; no more need be said.

In addition to *Commonwealth v. Johnson*, 457 Pa. 554, 327 A.2d 632 (1974), *supra*, we have applied this portion of the *Culombe* test in several other cases. See, e. g., *Commonwealth v. Smith*, 447 Pa. 457, 291 A.2d 103, 104 (1972):

> "An appellate court does not weigh evidence or pass upon the credibility of witnesses, and there is no basis for us to hold as a matter of law that the court's finding of voluntariness was not adequately supported and well within the court's discretion."

*Commonwealth v. Eiland*, 450 Pa. 566, 301 A.2d 651, 653 (1973):

> "When the suppression court has determined that no beatings or physical coercion occurred 'the appellate court will accept the determination of the [trier] of facts if there was any substantial evidence to support [its] conclusion' *Commonwealth v. Johnson*, 365 Pa. 303, 314, 74 A.2d 144, 149, reversed on other grounds, 340 U.S. 881, 71 S.Ct. 191, 95 L.Ed. 640 (1950)."

See also *Commonwealth v. Tucker*, 461 Pa. 191, 335 A.2d 704 (1975); *Commonwealth v. Long*, 460 Pa. 461, 333 A.2d 865 (1975).

*Petrakovich,* 459 Pa. 511, 523, 329 A.2d 844, 859 (1974). We find no abuse of discretion here. As this Court said long ago in the case of *Commonwealth v. Farrell,* 187 Pa. 408, 41 A. 382 (1898): "Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross-examination." 187 Pa. at 423, 41 A. at 384. See also *Commonwealth v. Coades,* 454 Pa. 448, 452, 311 A.2d 896 (1973); *Commonwealth v. Cheatham, supra; Lenahan v. Pittston Coal Mining Co.,* 221 Pa. 626, 70 A. 884 (1908); *Commonwealth v. Emmett,* 74 Pa.Super. 86 (1920). Questioning concerning the witness' alleged threats was obviously designed to bring out the strength of Joan's "feeling" towards her brother; the fact that she made them was a significant factor to be considered by the jury in passing upon her credibility.[6]

■■ We consider next appellant's argument that the trial court unduly restricted the scope of the voir dire examination and improperly denied several challenges for cause. For the most part, the questions defense counsel was not permitted to ask fell into two categories: *first,* questions through which counsel sought to ascertain the attitude of veniremen toward the defendant, including why they felt they were not prejudiced against him; *second,* questions seeking to explore prospective jurors' reactions to the possible failure of the defendant to take the stand or present any evidence on his behalf. Both types of inquiry are foreclosed by our decision in *Commonwealth v. Lopinson,* 427 Pa. 284, 234 A.2d 552 (1967). As to the first category of questions, we there said, "The only legitimate inquiry in this area was

6. In connection with these same questions, appellant contends that the court erred because it failed to charge that the threats made by Miss Sparrow were to be considered solely insofar as they related to her credibility and were not to be considered as substantive evidence of any guilt on the part of the defendant. Because, however, no point for charge was offered to this effect and no objection was made to the failure so to charge, the issue has been waived. Pa.R.Cr.P. 1119(b), 19 P.S. (1975 pamphlet); *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974).

whether or not the juror had formed a *fixed opinion* in the case as to the accused's guilt or innocence." 427 Pa. at 298, 234 A.2d at 561 (emphasis added). Concerning the second type of questions, we said in *Lopinson* that such questions are "wholly unwarranted and properly excluded." *Id.*

As to the challenges for cause which are now claimed to have been improperly denied, we must bear in mind "that the scope of the voir dire examination rests in the sound discretion of the trial judge and his decisions, even in a challenge for cause, will not be reversed in the absence of palpable error." *Commonwealth v. McGrew*, 375 Pa. 518, 526, 100 A.2d 467, 471 (1953); *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A.2d 552 (1967). Applying this rule, we find that no abuse of discretion occurred. In each case the record shows that none of the prospective jurors so challenged was possessed of any animus towards the appellant, or entertained a fixed opinion as to his guilt or was for any other reason subject to disqualification for cause.

Finally, in addition to the alleged trial errors we have discussed, Sparrow urges reversal of his robbery conviction (or at least vacation of the sentence for robbery) on the ground that his Fifth Amendment guarantee against double jeopardy was violated when he was sentenced on both the murder and the robbery convictions.[7] His theory is that the offense of robbery

7. The Constitution of Pennsylvania, in article I, section 10, like the Fifth Amendment to the Constitution of the United States, guarantees that "[n]o person shall, for the same offense, be twice put in jeopardy of life or limb". The clause in our state constitution, however, has traditionally been thought to apply only in capital cases. *Commonwealth v. Baker*, 413 Pa. 105, 196 A.2d 382 (1964); *McCreary v. Commonwealth*, 29 Pa. 323 (1857). Double jeopardy claims in other types of cases have thus normally been asserted under the federal constitution, *Commonwealth v. Richbourg*, 442 Pa. 147, 275 A.2d 345 (1971); *Commonwealth v. Silverman*, 442 Pa. 211, 275 A.2d 308 (1971), or through the pleas of autrefois acquit or autrefois convict, *Commonwealth ex rel. Papy v. Maroney*, 417 Pa. 368, 207 A.2d 814 (1965), or under the so-

502

merged into the offense of robbery-murder, and so disappeared as a separate crime for which he could be sentenced.

 There was ample evidence in the case (such, for example, as Sparrow's announced purpose, "I'm going to get me a homicide") from which the jury could find that the slaying of Joseph Jaworski was wilful, deliberate and premediated. Were that the basis of the verdict of murder in the first degree, there would be no room for the double jeopardy argument. But the jurors were charged that they could also return that verdict if they determined that the killing occurred during the commission of a robbery. Since there is no way of knowing on which theory the jury proceeded, we must consider appellant's contention that the robbery offense, if it lay behind the murder verdict, merged into the offense of murder and is not separately punishable. We conclude that the argument is without merit.

called merger doctrine discussed in the text, *infra.* For a further discussion of the Pennsylvania double jeopardy clause, see the opinion of Mr. Justice ROBERTS speaking for a plurality of the Court in *Commonwealth v. Campana,* 452 Pa. 233, 243–245, 304 A.2d 432, 436–437 (1973), *vacated and remanded,* 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), *on remand,* 455 Pa. 622, 314 A.2d 854 (1974), *cert. denied,* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

The issue of the propriety of the sentencing of appellant Sparrow on both his conviction for murder and his conviction for robbery was not raised at the time of sentencing or in posttrial motions. In *Commonwealth v. Walker,* 468 Pa. 323, 362 A.2d 227 (1976), this Court held that a challenge to the sentencing of the appellant for both forcible and statutory rape based upon a single incident of intercourse was not waived by Walker's failure to raise the issue for consideration by the trial court; the issue was "exclusively . . . the lawfulness of the sentence imposed upon these convictions." 362 A.2d at 230. This writer dissented in *Walker, supra,* 362 A.2d at 233, on the ground that consideration of the double jeopardy issue had been foreclosed by the holding in *Commonwealth v. Piper,* 458 Pa. 307, 328 A.2d 845 (1974). In *Piper* the Court decided (also over this writer's dissent) that failure to object at the time of sentencing to the constitutionality of the sentence imposed constituted a waiver of that issue. Cf. *Commonwealth v. Bartolomucci,* 468 Pa. 338, 362 A.2d 234 (1976) (dissenting opinion of Pomeroy, J.). Because we are bound by *Walker, supra,* we shall proceed to consider the merits of the double jeopardy issue raised in this case.

■■ Our decisions on the doctrine of merger are not altogether harmonious. In general, however, the rule has been limited to situations where the offenses involved were in effect merely degrees of the same principal crime and the same facts proved both. The focus has been on the conduct of the defendant; if there is essentially but one criminal act, there can be but one punishment.[8] An obvious example is that of an attempt to commit an offense, and the completed offense; the former merges into the latter. See also *Commonwealth ex rel. Russo v. Ashe*, 293 Pa. 322, 142 A. 317 (felonious assault with intent to maim and disfigure, merges into felonious assault with intent to murder); *Commonwealth, ex rel. Shaddock v. Ashe*, 340 Pa. 286, 17 A.2d 190, (1941) (assault and battery with intent to commit rape and aggravated assault and battery merge into rape); *Commonwealth v. Nelson*, 452 Pa. 275, 305 A.2d 369 (1973) (assault and battery in resisting arrest merges into assault and battery). These cases bear out the formulation of the doctrine in *Russo, supra*, that "where the distinct crimes set forth [in an indictment] grow out of the same transaction, differing only in degree, only one penalty can be imposed after conviction". 293 Pa. at 324, 142 A. at 318.

The test for merger was restated in *Commonwealth ex rel. Moszcynski v. Ashe*, 343 Pa. 102, 21 A.2d 920 (1941) as follows:

"The true test of whether one criminal offense has merged in another is *not* (as is sometimes stated) whether the two criminal acts are 'successive steps in

8. "This Court has not had occasion to consider the question whether, following application of the Fifth Amendment's Double Jeopardy Clause to the states in *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), our 'merger' decisions might satisfy the requirements of federal double jeopardy law. Our merger test, however, focuses on the conduct of the defendant rather than on evidentiary considerations and as such is generally thought more lenient to defendants than the 'same evidence' tests. See Note, Twice in Jeopardy, 75 Yale L.J. 262, 275 (1965)." *Commonwealth v. Campana,* 452 Pa. 233, 274 n. 11, 304 A.2d 432, 448 n. 11 (1973) (dissenting opinion of this writer).

the same transaction' but it is whether one crime *necessarily involves another*, as, for example, rape involves fornication, and robbery involves both assault and larceny. . . . When one of two criminal acts committed successively is not a necessary ingredient of the other, there may be a conviction and sentence for *both*." 343 Pa. at 104, 21 A.2d at 921 (emphasis in original).

See also *Commonwealth v. Hill*, 453 Pa. 349, 310 A.2d 88 (1973) ; *Commonwealth v. Comber*, 374 Pa. 570, 97 A.2d 343 (1953). It is true, of course, that the offense of murder in the first degree, when based on the concomitant commission of a different felony, "necessarily involves" that other felony in the sense that the felony supplies the essential ingredient of malice. The language above quoted from *Moszcynski*, however, is not to be given so literal an interpretation. In that case, the defendant had been convicted and sentenced for bank robbery, breaking and entering with intent to commit a felony and a felonious attempt to kill. The Court held that although these several crimes arose from the same continuous episode, no one of them was a necessary ingredient of the others, and no merger occurred. The Court was there concerned to disapprove a line of cases which had held that all that was necessary to invoke the merger doctrine was the fact that " 'two or more of the things forbidden are but successive steps in the same transaction,' " *Commonwealth ex rel. Ciampoli v. Heston*, 292 Pa. 501, 503, 141 A. 287, 288 (1928) ; it was in no way considering a felony-murder situation, which bears but a superficial similarity to those circumstances in which merger has been found.

"As applied in Pennsylvania, common law felony-murder 'is a means of imputing malice where it may not exist expressly . .' " *Commonwealth v. Yuknavich*, 448 Pa. 502, 506, 295 A.2d 290, 292 (1972), quoting from *Commonwealth ex rel. Smith v. Myers*, 438 Pa. 218,

224–25, 261 A.2d 550, 553 (1970).[9] This degree of commonality, and the circumstance that both crimes were committed in the course of a single "episode", cannot obscure the obvious fact that robbery is not a lesser degree of murder; it is a totally discrete offense.[10] Both our common law and statutory law has said that when an unjustified killing occurs in the course of the commission of a robbery (or other specified felony) the killing is not simply an unfortunate accident or manslaughter or even murder in the second degree, but is murder in the first degree. It is a simple matter of definition of the crime involved in one type of wrongful killing: if the killing is committed in the course of committing another specified type of crime, the homicide is murder in the first degree. The societal interest behind such a doctrine is the preservation of human life, so often casually forfeited in the commission of crimes of violence. That purpose would be ill-served by a rule which would say to a felon that "if you happen to kill the victim of your robbery (or your rape, or burglary, or kidnapping or arson) you will not be punished for the underlying crime." Sparrow committed two distinct crimes, robbery and murder; one was a stealing, the other a killing. There was no merger of

**9.** *See also* Act of June 24, 1939, P.L. 872 § 701, 18 P.S. § 4701 (repealed, June 6, 1973); 18 Pa.C.S. § 2502.

**10.** In *Commonwealth v. Smith,* 452 Pa. 1, 10, 304 A.2d 456, 461 (1973), Mr. Justice O'Brien, speaking for himself and Mr. Justice Pomeroy, in the opinion rendering the judgment of the Court, dealt with this issue as follows:

"Appellant argues that, since he was convicted of a first-degree murder, it necessarily 'involved' the robbery because there was no other evidence which would support a verdict of murder in the first degree. We disagree. All robberies are not murders: the two offenses do not merge. If only one of the verdicts were overturned, the other could still stand."

Mr. Chief Justice Jones and Mr. Justice Eagen concurred in the result. Mr. Justice Roberts filed a dissenting opinion on another issue, in which Mr. Justice Nix joined; Mr. Justice Manderino noted a dissent.

these crimes, and he cannot complain that he was sen-tenced for both.[11]

11. Our interpretation of the merger doctrine and our decision to-day is, we believe, completely consistent with the relevant provi-sion of the new Crimes Code:

"Although a prosecution is for a violation of a different pro-vision of the statutes than a former prosecution or is based on different facts, it is barred by such former prosecution under the following circumstances:

(1) The former prosecution resulted in an acquittal or in a conviction as defined in section 109 of this title (relating to when prosecution barred by former prosecution for same of-fense) and the subsequent prosecution is for:

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

(iii) the same conduct, unless:

(A) the offense of which the defendant was formerly convict-ed or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil". 18 Pa.C.S. § 110.

See and compare § 1.07(4) of the Model Penal Code, (proposed of-ficial draft, 1962).

Our decision today is also in accord with the weight of authori-ty in other jurisdictions: In State v. Briggs, 533 S.W.2d 290, 291 (Tenn.1976), the Supreme Court of Tennessee, overruling one of its earlier cases, Acres v. State, 484 S.W.2d 534 (Tenn.1972), refused to hold that robbery was a lesser included offense of murder so as to prevent separate conviction and punishment for the robbery as well as the murder in a robbery-murder situation. Said the court:

"The Acres opinion has been generally understood as author-ity for the proposition that one who commits a murder in the perpetration of a robbery cannot be convicted both for the rob-bery and for first degree murder; the theory being that the robbery is a lesser included offense within the offense of first degree murder because under our statute, T.C.A. § 39–2402, the perpetration of the robbery serves, in lieu of premeditation, to constitute one of the essential elements of first degree mur-der.

"So understood, the decision in Acres is contrary to the great majority of the decisions in this country dealing with this specific issue. State v. Hall, 86 Idaho 63, 383 P.2d 602 (1963); McChan v. State, 9 Md.App. 311, 264 A.2d 130 (1970); Brown v. State, 10 Md.App. 416, 271 A.2d 194 (1970); State v. Moore, 326 Mo. 1199, 33 S.W.2d 905 (1930); State v. Calvo, 240 La. 75, 121 So.2d 244 (1960), cert. den. 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960); Centers v. Commonwealth, 318 S.W.2d 57 (Ky.1958); State v. Orth, 106 Ohio App. 35, 153 N.E.2d 394 (1957); State v. Barton, 5 Wash.2d 234, 105 P.2d 63 (1940); Carmody v. Seventh Judicial District Court, 81 Nev. 83, 398 P.2d 706 (1965), 11 A.L.R.3d 828; Commonwealth v. Crecorian, 264 Mass. 94,

Having concluded that the merger doctrine is inapplicable to the facts of this case because separate offenses are involved, we are satisfied that no double jeopardy problem is posed under the Constitution of the United States. Cf. *Turner v. Arkansas*, 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972) ; *Wells v. Missouri*, 419 U.S. 1075, 95 S.Ct. 665, 42 L.Ed.2d 671 (1974) (Opinion of Mr. Justice Brennan, joined by Mr. Justice Douglas and Mr. Justice Marshall dissenting from the denial of certiorari).

Judgments of sentence affirmed.

162 N.E. 7 (1928); *Duvall v. State*, 111 Ohio St. 657, 146 N.E. 90 (1924); *People v. Johnson*, 67 Cal.App.2d 195, 153 P.2d 784 (1944); *Johnson v. People*, 152 Colo. 586, 384 P.2d 454 (1963), cert. den. 376 U.S. 922, 84 S.Ct. 682, 11 L.Ed.2d 617 (1964). The holding in each of the foregoing cases is that robbery is neither the same nor an included lesser offense within the crime of murder in the first degree and that convictions for both offenses may properly be allowed to stand when murder is committed during the perpetration of a robbery.

\* \* \* \* \* \* \* \* \* \*

"We find neither reason nor authority for holding that one who commits murder during the perpetration of a felony named in the T.C.A. § 39–2402(4) cannot or should not be convicted and punished for both the offense of murder in the first degree and for the named felony. Nothing in the statutory definitions of murder in the first degree and of the felonies listed in T.C.A. § 39–2402(4) indicates a legislative intent that conviction and punishment for both offenses should not be permitted. Moreover, we agree with the holding in each of the cases from our sister states, supra, that the felony during the perpetration of which a murder is committed is neither the same offense as murder in the first degree nor a lesser offense included within that charge; hence, to permit convictions and punishments for both murder in the first degree and the other felony to stand in no way offends the constitutional protection from double jeopardy."

Accord, *Price v. State*, 261 Md. 573, 277 A.2d 256 (1971) (no merger in an arson-murder killing). Contra, *People v. Anderson*, 62 Mich.App. 475, 233 N.W.2d 630 (1975); *State ex rel. Wikberg v. Henderson*, 292 So.2d 505 (La.1974); *Ex parte Jewel*, 535 S.W. 2d 362 (Tex.Cr.App.1976); *Ronzani v. State*, 24 Wis.2d 512, 129 N.W.2d 143 (1963). See also *Reeves v. Henderson*, 380 F.Supp. (W.D.La.1974).

ROBERTS, J., filed a dissenting opinion in which MANDERINO, J., joined.

NIX, J., filed a dissenting opinion, in which ROBERTS, J., joined.

ROBERTS, Justice, dissenting.

The majority does not apply the proper standard for review of the voluntariness of appellant's admission. It treats the trial court's determination of voluntariness purely as a question of fact and, as a result, fails to make the necessary inquiry into appellant's claim. I dissent.[1]

It is clear from our previous cases that we must independently determine whether a confession is voluntary. *Commonwealth v. Eiland*, 450 Pa. 566, 301 A.2d 651 (1973); *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A.2d 426 (1968). This procedure is constitutionally required. "It is our duty in . . . cases dealing with the question whether a confession was voluntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); see *Malinski v. New York*, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). Moreover, when psychological coercion is alleged, a particularly close analysis of the surrounding circumstances is necessary. *Commonwealth v. Alston*, 456 Pa. 128, 133–34, 317 A.2d 241, 244 (1974); *Commonwealth v. Eiland*, supra at 574, 301 A.2d at 654; *Commonwealth ex rel. Butler v. Rundle*, supra at 149, 239 A.2d at 430.

---

1. My discussion in this dissenting opinion is directed primarily to the issue of the voluntariness of appellant's admissions, the determination of which is necessary to the decision of this case. My omission of discussion of the other issues raised by appellant should not be construed as implicit agreement with either the analyses or conclusions in the majority opinion.

In making this determination, we may:

". . . consider only 'the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' *Culombe v. Connecticut,* 367 U.S. [568, 604], 81 S.Ct. [1860, 1878, 6 L.Ed. 2d 1037 (1961)]."

*Commonwealth ex rel. Butler v. Rundle,* supra at 149–50, 239 A.2d at 430.

The majority uses a much more restricted standard of review. It contends that the suppression "court found that the statements were voluntary" and that this finding "supported by the record, may not be disturbed." This is a clearly mistaken standard which unnecessarily abdicates our obligation on review.

The suppression court's "finding" of voluntariness, like its "finding" that appellant "received the benefit of procedural and substantive safeguards set forth by the United States Supreme Court," is not simply a finding of fact. Rather, these "findings" involve inferences made from the facts, and the application of legal principles to those inferences. See *Culombe v. Connecticut,* 367 U.S. 568, 603, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1058 (1961) (Opinion of Frankfurter, J.). Such findings must not be insulated from review. If such findings are treated as pure questions of fact, this Court abdicates its responsibility to review alleged violations of constitutional rights. "[W]here necessary to the determination of constitutional rights, [this Court must] make an independent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental—i. e.,— constitutional—criteria established by this Court have been respected." *Ker v. California,* 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963); accord *Fiske v. Kansas,* 274 U.S. 380, 385–86, 47 S.Ct. 655, 656–57, 71 L.Ed. 1108 (1927) ("this Court will review the findings

of facts by a State court . . . where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts."). See generally P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 574–620 (2d ed. 1973).

Thus, Justice Frankfurter in his opinion in *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), recognized that a "finding" of voluntariness was not simply a finding of fact, precluding further review by appellate courts if supported by the record:

> "The notion of 'voluntariness' is itself an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes. Since the characterization is the very issue 'to review which this Court sits,' *Watts v. State of Indiana,* 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 (opinion of Frankfurter, J.), the matter of description, too, is necessarily open here. See *Lisenba v. People of State of California,* 314 U.S. 219, 237–238, 62 S.Ct. 280, 290, 86 L.Ed. 166; *Ward v. State of Texas,* 316 U.S. 547, 550, 62 S.Ct. 1139, 1141, 86 L.Ed. 1663; *Haley v. State of Ohio,* 332 U.S. 596, 599, 68 S.Ct. 302, 303, 92 L.Ed. 224; *Malinski v. People of State of New York,* 324 U.S. 401, 404, 417, 65 S.Ct. 781, 783, 789, 89 L.Ed. 1029.
>
> No more restricted scope of review would suffice adequately to protect federal constitutional rights. For the mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially—that is, by inference; and it cannot be competent to the trier of fact to preclude our review simply by declining to draw inferences which the historical facts compel."

Id. at 604–05, 81 S.Ct. at 1880. Clearly, the suppression court's "finding" of voluntariness does not relieve this

Court of its responsibility to review the voluntariness of appellant's confession in the totality of the circumstances.

Justice Frankfurter recognized three phases of inquiry, although he also recognized that in practical application these phases become interwoven. First, the raw "historical facts" must be determined. Next, the defendant's psychological state is inferred from these facts. Finally, legal principles are applied to these inferences to determine voluntariness. The passage quoted and relied upon by the majority, to support its assertion that a "finding" of voluntariness must be upheld if it is supported by the record, applies only to the "crude historical facts."

"The inquiry whether, in a particular case, a confession was voluntarily or involuntarily made involves, at the least, a three-phased process. First, there is the business of finding the crude historical facts, the external, 'phenomenological' occurrences and events surrounding the confession. Second, because the concept of 'voluntariness' is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, 'psychological' fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances.

In a case coming here from the highest court of a State in which review may be had, the first of these phases is definitely determined, normally, by that court. Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom

those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford.

This means that all testimonial conflict is settled by the judgment of the state courts. Where they have made explicit findings of fact, those findings conclude us and form the basis of our review—with the one *caveat*, necessarily, that we are not to be bound by findings wholly lacking support in evidence."

Id. at 603, 81 S.Ct. at 1879. Clearly, the inferences the suppression court draws about the accused's psychological state, and its determination on voluntariness, are not the kinds of factual determinations beyond appellate review.[2] The majority completely fails to comprehend Justice Frankfurter's analysis.

Because it applies the wrong standard, the majority fails to analyze the voluntariness of appellant's statements in the totality of the circumstances. Every cir-

---

**2.** *Commonwealth v. Johnson*, 457 Pa. 554, 327 A.2d 632 (1974), relied on by the majority, is not to the contrary, *Johnson* merely stands for the proposition that when there is conflicting testimony, "it is the exclusive province of the trier of facts to pass upon the credibility of witnesses." *Commonwealth v. Garvin*, 448 Pa. 258, 269, 293 A.2d 33, 39 (1972). Indeed, neither of the cases cited in *Johnson*, *Commonwealth v. Karchella*, 449 Pa. 270, 273, 296 A.2d 732, 733 (1972); *Commonwealth v. Garvin*, supra, involved a challenge to the voluntariness of a confession. Rather, they involved the resolution of conflicting testimony by the trial court. This is the kind of "historical fact" which is upheld if supported by the record.

Although classification is difficult, it appears that the trial court's finding that "[t]he defendant was warned of his rights on three occasions" is usually such an "historical fact." It obviously entails a legal conclusion about what rights the accused must be warned of and the form warning must take, however, and thus is not always insulated from review. The finding that appellant was "alert, responsive, normal and not under the influence of drugs or intoxicants" involves a determination of historical facts, but it also involves inferences about his psychological state.

Finally, the conclusion that appellant's statements were obtained "without fear, threats, brutality or other forms of duress, or in response to any direct or implied promises" involves not only historical facts and inferences as to the accused's psychological state, but also legal conclusions, in particular, legal conclusions as to what kinds of police interrogation practices tend to overbear the will of the accused.

cumstance that may have affected appellant's will must be considered and any admission or confession which was not a product of an essentially free and unconstrained choice by the accused must be suppressed. *Commonwealth v. Alston,* supra at 131–33, 317 A.2d at 242–43 (1974); *Commonwealth v. Eiland,* supra at 574, 301 A. 2d at 654; *Commonwealth ex rel. Butler v. Rundle,* supra at 149–51, 239 A.2d at 430–31.

We listed the following factors as crucial to this inquiry:

" . . . the duration, and the methods of interrogation; the conditions of detention, the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain ones powers of resistance to suggestion and undermine his self-determination."

*Commonwealth v. Alston,* supra at 134, 317 A.2d at 244; see *Commonwealth v. Purvis,* 458 Pa. 359, 364, 326 A.2d 369, 371 (1974); *Commonwealth ex rel. Butler v. Rundle,* supra at 149, 239 A.2d at 430.

In this case, the following facts are uncontradicted. Appellant was arrested at approximately 4:30 p. m., October 17, 1972, and arrived at the Police Administration Building at 5:00 p. m. From 5:00 p. m. until 9:25 a. m., October 18, 1972, appellant was interrogated by several teams of detectives. He was left alone for various intervals, during which he was manacled in the interrogation room and thus was denied any effective rest. During the first eight hours, appellant consistently denied any involvement in the crime.[3] At 12:40 a. m., he made the first statement later used by the Commonwealth. The interrogation based on this first statement lasted until 2:30 a. m. From 2:30 a. m. until 5:00 a. m., appellant was again manacled and left alone. Between 5:00 a. m.

---

**3.** Appellant was given *Miranda* warnings before each of three initial interrogation sessions.

and 7:00 a. m., appellant made a further admission, adding details to his first statement.[4] He was once again manacled and left alone until 9:25 a. m., when he was allowed to confer with his attorney and later allowed to meet with his father. He was again shackled and left alone until 5:00 p. m., October 18, when he was finally arraigned, more than twenty-four hours after his arrest.

Only after eight hours in custody, and seven and one-half hours of interrogation, did appellant make an incriminating statement. Appellant's further admission came more than twelve hours after arrest, and he was not arraigned until more than twenty-four hours after his arrest.[5] Given the coercive nature of such an extend-

4. In its memorandum opinion, the suppression court stated: "The interrogation was not prolonged but rather was interrupted by offers of food, water, cigarettes and rest." The majority apparently treats this as a finding that the interrogation was not prolonged, but it is clear that what the trial court meant is that the interrogation was not continuous. The Commonwealth does not contest that appellant was interrogated over a twelve hour period. If the suppression court had made a finding that interrogation was not prolonged, such a finding would clearly not be supported by the record.

5. The presence of an unnecessary delay in securing a preliminary arraignment must be considered as an aspect of the voluntariness inquiry. *Commonwealth v. Eiland*, 450 Pa. 566, 572, 301 A.2d 651, 653 (1973); *Commonwealth v. Koch*, 446 Pa. 469, 474–75, 288 A.2d 791, 794 (1972).

In *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 155–56, 239 A.2d 426, 433 (1968), this Court, in an opinion by Mr. Justice O'Brien, recognized that pre-arraignment delay is relevant to the voluntariness of any statements taken, even if the delay takes place after the confession:

"We cannot accept the contention that since the confession was made on the day of arrest, the succeeding six days are irrelevant to a consideration of the question of voluntariness of the confession. *Haley v. Ohio* [332 U.S. 596, 600, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948)], dealt with the question of post-confession improper police tactics: 'It is said that these events are not germane to the present problem because they happened after the confession was made. But they show such a callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels that we take with a grain of salt their present apologia that the five-hour grilling of this boy was conducted in a fair and dispassionate manner. When the police are so unmindful of these

ed pre-arraignment delay, I cannot agree that the statements taken from appellant were voluntary.

Appellant's claim that he was denied access to counsel highlights the involuntariness of his admissions. Appellant retained counsel shortly before he was arrested, and counsel instructed him to make no statement unless counsel was present. After appellant's later admission, he read the statement, but declined to sign it, stating that he would sign nothing until he had talked to his attorney. I can only conclude that when appellant made admissions to the police, in disregard of the advice of retained counsel, it was because his will was overborne, especially since appellant still wanted to see his attorney after he made these statements.[6]

> basic standards of conduct in their public dealings, their secret treatment of a 15-year-old boy behind closed doors in the dead of night becomes darkly suspicious.' Here, too, the post-confession activity of the police colors the proceedings leading up to that confession."
>
> Accord, *Commonwealth v. Coach*, 471 Pa. 389, 370 A.2d 358 (1977).
>
> The record shows no administrative procedure which would justify the pre-arraignment delay in this case. The only possible conclusion is that the delay was for the purpose of extracting a confession from appellant.

6. This case highlights the need for a rule that once counsel has undertaken to represent a defendant, the defendant in custody cannot waive his right to counsel unless counsel is present. *Commonwealth v. Hilliard*, 471 Pa. 318, 370 A.2d 322 (1977). (Opinion announcing the Judgment of the Court); *People v. Hobson*, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976); see *Commonwealth v. Hawkins*, 448 Pa. 206, 220, 292 A.2d 302, 309 (1972) (Dissenting Opinion of Nix, J., joined by Roberts and Manderino, JJ.). Appellant testified that he repeatedly requested to have his attorney present during interrogation. The suppression court rejected this claim, however, and this is the kind of purely factual question which is left to the suppression court. Thus, for the purposes of this appeal, we must assume that appellant did not request counsel until after he made the admissions. It should be apparent, however, that the accused's right to counsel is inadequately protected if it must depend on the outcome of "the almost inevitable 'swearing contest' over what happened behind the closed doors." Y. Kamisar, W. La Fave & J. Israel, Modern Criminal Procedure 513 (4th ed. 1974). See also *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (pres-

The Commonwealth argues that there was no prejudice in admitting these statements into evidence because they were substantially the same as those testified to by appellant at trial. However, appellant's testimony may have been induced by his earlier admissions while being interrogated and therefore should be suppressed as a fruit of the former illegality. See *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L. Ed.2d 1047 (1968); *Commonwealth v. Saunders,* 459 Pa. 677, 683, 331 A.2d 193, 195 (1975) (Dissenting Opinion of Nix, J., joined by Roberts, J.).

Nor can I agree with the Commonwealth's contention that the statement was admissible for the purpose of impeaching appellant's testimony. In *Commonwealth v. Triplett,* 462 Pa. 244, 248–49, 341 A.2d 62, 64 (1975), this Court stated:

"We are of the opinion that any statement of a defendant declared inadmissible for any reason by a suppression court cannot be used for the purpose of impeaching the credibility of a defendant who elects to testify on his own behalf."

Thus, it is clear that an involuntary confession must be excluded for the purposes of impeachment of defendant at trial.

I cannot agree that appellant's admissions were voluntary. I dissent, and would grant appellant a new trial.

MANDERINO, J., joins in this dissenting opinion.

NIX, Justice, dissenting.

I share Mr. Justice ROBERTS' view that the majority did not employ the proper standards for appellate review of the voluntariness claim. While it is true, as pointed

ence of counsel at line-up is necessary to insure that defense can accurately reconstruct what took place); *Commonwealth v. Whiting,* 439 Pa. 205, 266 A.2d 738, cert. denied, 400 U.S. 919, 91 S.Ct. 173, 27 L.Ed. 159 (1970) (same).

out by the majority, that appellate courts should accept findings of fact of the hearing judge where supported by the record, it is nevertheless the responsibility of the appellate court to examine the inferences drawn from the factual findings and to independently test the conclusions of law derived from those facts and inferences. In the instant case, the majority accepted not only the findings of fact, but also blindly followed the inferences and legal conclusions drawn by the hearing judge from those facts.[1] This obviously resulted in a denial of appellant's appellate review as to this issue.

Furthermore, I cannot agree with that part of the majority opinion which upholds the imposition of sentence on appellant's conviction for robbery as if it were a separate crime. Appellant was convicted of murder of the first degree as well as robbery. The statute applicable to this case defines murder of the first degree as follows:

"All murder which shall be perpetrated by means of . . . willful, deliberate and premeditated killing, or which shall be committed in the perpetration of . . . any arson, rape, *robbery*, burglary, or kidnapping shall be murder in the first degree." Act of June 24, 1939, P.L. 872, § 701, *as amended*, 18 P.S. § 4701 (Appx.1973) (emphasis added), *now repealed and replaced by*, 18 Pa.C.S. § 2502 (Supp.1976–77).

It is impossible to ascertain whether the jury's verdict of murder in the first degree was premised on a finding that the slaying was willful, deliberate and premeditated, or a finding that the killing occurred during the commission of a robbery, one of the felonies enumerated in the statute. Both theories were submitted to the jury. If the jury's verdict of murder in the first degree was

1. For illustration, what the hearing judge set forth and the majority accepted as an explicit "finding of fact" was in reality a conclusion of law.

"1. The Commonwealth, through the testimony of police officers, established by a preponderance of credible testimony that the statement of defendant *was voluntary*." (Emphasis added).

based on a felony-murder theory it would, in my judgment, constitute double punishment to sentence appellant independently on the underlying enumerated felony. In such a case, the defendant is not only subjected to a penalty under the separate robbery conviction, but he is also subjected to an *enhanced* penalty on the murder charge as a result of the underlying enumerated felony of robbery. Such a result violates the double jeopardy provisions of both the federal and state[2] constitutions and accordingly, I dissent.

It should first be noted that the majority has chosen not to analyze the problem arising in this case in accordance with double jeopardy principles,[3] but instead relies on a cursory application of this jurisdiction's merger doctrine to determine that robbery and murder are separate crimes, which do not merge, so that separate sentences are proper. In so holding, the majority not only misapplies the merger doctrine,[4] but reveals that it misperceives the issue raised on this appeal. The issue is *not*, as the majority has framed it, whether the separate

2. Art. I, § 10 of the Pennsylvania Constitution reads in pertinent part: "No person shall, for the same offense, be twice put in jeopardy of life or limb; . . ." While I agree with the majority that the Pennsylvania Double Jeopardy Clause was *formerly* thought to be limited only to what were heretofore "capital" offenses, Majority Opinion, *ante* at 718, n. 7, that interpretation was, in my judgment, discredited when the United States Supreme Court decided *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), holding that the double jeopardy protection under the federal constitution applies to *all* criminal offenses. In light of that decision, it would be the sheerest of folly to continue to interpret our state constitutional provision in a manner that would afford less protection than that mandated by the federal constitution. Such a result would effectively render the state provision meaningless. Thus, in order to comply with the rule of construction that the constitution is not to be interpreted to lead to an impracticable or unreasonable result, *Commonwealth v. Novak*, 395 Pa. 199, 150 A.2d 102 (1959), Art. I, § 10 must at least be interpreted as coextensive with its federal counterpart in the protection it provides.

3. In framing the issue, appellant specifically claimed a violation of the state and federal double jeopardy provisions.

4. See discussion at pp. 728–729, *infra*.

penalty imposed on the robbery conviction comports with this jurisdiction's merger rules. Rather, the question requires a decision as to whether the sentence can pass constitutional muster. The majority's approach is even more inexplicable in light of its concession that we have not decided "[whether] our 'merger' decisions might satisfy the requirements of federal double jeopardy law." *Ante* at 718, n. 8.

The Double Jeopardy Clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb; . . . " In *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), the Supreme Court concisely set forth the well-established parameters of the protection afforded by the clause.

> " '[It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. *And it protects against multiple punishments for the same offense.'* " *Id.* at 343, 95 S.Ct. at 1021, *quoting from, North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (emphasis added).

The prohibition of the Double Jeopardy Clause against "multiple punishments" has been recognized by this Court as well. *See Commonwealth v. Silverman,* 442 Pa. 211, 275 A.2d 308 (1971); *Commonwealth v. Campana,* 452 Pa. 233, 304 A.2d 432, *vacated,* 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), *reinstated on remand,* 455 Pa. 622, 314 A.2d 854, *cert. denied,* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).[5] It is clear under this principle that if a particular offense serves as the basis,

5. "Thus, the double jeopardy prohibition has two functions: (1) It denies the government an opportunity to convict a defendant of an offense after he has once been acquitted of that offense; and (2) It prohibits the government from exacting multiple punishments for the same offense."
*Commonwealth v. Campana, supra,* 442 Pa. at 261, 204 A.2d at 450 (Concurring opinion of this writer).

in whole or in part, for the imposition of a sentence, any further infliction of punishment for the same criminal conduct would violate the constitutional guarantee.

The 1939 Penal Code, in failing to define the crime of murder, incorporated the common law definition of that crime. In setting forth the elements of common law murder in this jurisdiction, this Court stated in the landmark case of *Commonwealth v. Drum,* 58 Pa. 9 (1868), that "[t]he distinguishing criterion of murder is malice aforethought." *Id.* at 15.

> "With this 'criterion' as the basis, the doctrine of felony-murder became firmly imbedded in the common law. As applied in Pennsylvania, common law felony-murder 'is a means of imputing malice where it may not exist expressly. Under this rule, the malice necessary to make a killing, even an accidental one, murder, is constructively inferred from the malice incident to the perpetration of the initial felony.' *Commonwealth ex rel. Smith v. Myers,* 438 Pa. 218, 224–25, 261 A.2d 550, 553 (1970)." *Commonwealth v. Yuknavich,* 448 Pa. 502, 506, 295 A.2d 290, 292 (1972).

The 1939 Penal Code did, however, divide murder into "degrees." Under the statute, all murder was deemed murder of the second degree, unless the killing was "willful, deliberate and premeditated," or it occurred in the perpetration of any "arson, rape, robbery, burglary, or kidnapping," in which case it was murder of the first degree.[6] Because the legislature determined that certain types of murder were more heinous than others, it imposed a more severe sanction on the actor if the killing was accompanied by one of the "aggravating circumstances" enumerated in the statute. This being so, the

---

**6.** *See* Act of June 24, 1939, P.L. 872, § 701, *as amended,* 18 P.S. § 4701 (Appx.1973), *now repealed and replaced by,* 18 Pa.C.S. § 2502 (Supp.1976–77). Murder of the first degree carried a maximum penalty of death, or life imprisonment, while the maximum penalty upon conviction of murder in the second degree was twenty years in a state correctional institution. *Id.*

commission of an enumerated felony not only serves to impute the malice from the illegal act to any death caused during its commission, in accordance with the common law rule, but it also provides by operation of the statute the additional aggravating circumstance necessary to raise the crime to murder of the first degree. The presence of the enumerated felony, such as robbery, operates to raise the degree of the crime of murder, thereby enhancing the *penalty* accorded. Restated, where common law murder rises to the first degree because of the accompanying underlying enumerated felony, then the felony itself becomes an *essential element* of the statutory crime of murder in the first degree. Therefore, the allowance of a separate sentence to be imposed upon the robbery indictment would be violative of the double jeopardy prohibition against multiple punishment.

Finally, it should be emphasized that the failure of the majority to distinguish between the role of all felonies under the common law felony-murder doctrine and the function of one of the enumerated felonies under the statutory felony-murder provision precipitated its erroneous application of the merger doctrine in this case.[7]

7. The majority states that the merger rule "has been limited to situations where the offenses involved were in effect merely degrees of the same principal crime and the same facts proved both." *Ante* at 718. This is misleading in two respects. First, in using the phrase "degrees of the same principal crime," the majority implies that the merger rule obtains only in situations where one crime is divided into degrees (i. e. murder of the first degree; murder of the second degree). This is clearly a misstatement of the law. Second, the majority's assertion that merger only operates as to offenses in which the "same facts prove both" is completely untenable. By definition, the greater offense must necessarily contain an element or elements in addition to those contained in the lesser. The majority thus appears to prohibit merger unless the offenses are in fact identical.

The true test for merger is: Whether all of the elements of the lesser offense are necessarily included in the greater. Stated another way, the offenses merge if the greater crime cannot be proven without establishing each of the elements of the lesser. *See Sansone v. United States*, 380 U.S. 343, 85 S.Ct. 1004, 13 L. Ed.2d 882 (1965); *Berra v. United States*, 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013 (1956).

Under the common law felony-murder doctrine, the felony provides the basis for imputing the malice necessary to raise a killing to murder. In this instance, as the majority correctly notes, the felony itself is not in fact an element of the murder, but rather it supplies the basis for the finder of fact to infer the requisite state of mind at the time of the killing. The majority confuses this concept with the function of the enumerated felony under the statutorily defined crime of murder in the first degree. There, the express language of the statute *prescribes* the presence of one of the underlying enumerated felonies as an integral part of the crime. Thus, the felony itself must be considered an essential element of the composite crime of murder in the first degree.[8]

In my judgment, the proper application of our merger test yields the conclusion that robbery is a necessary ingredient for the crime of murder of the first degree in the felony-murder context. Thus, the separate sentence imposed under the robbery indictment was violative not only of the constitutional double jeopardy prohibitions, but also our rules as to merger.

ROBERTS, J., joins in this dissent.

---

**8.** The result is no different under the criminal homicide provision of the new Crimes Code. Act of December 6, 1972, P.L. 1480, No. 334, § 1, *as amended*, 18 Pa.C.S. § 2502 (Supp.1976–77), which establishes three degrees of murder. While statutory felony-murder is now deemed to be murder of the second degree, the same reasoning clearly applies.